**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ATLANTIC COAST LIFE INSURANCE COMPANY and SENTINEL SECURITY LIFE INSURANCE COMPANY,<br><br>               Plaintiffs,<br><br>     v.<br><br>A.M. BEST RATING SERVICES, INC.,<br><br>             Defendant. | Civil Action No.<br><br>**VERIFIED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><u>**REDACTED VERSION**</u> |

Plaintiffs Atlantic Coast Life Insurance Company, a corporation with its principal place of business at 1565 Sam Rittenberg Blvd, Charleston, South Carolina 29407 ("Atlantic Coast"), and Sentinel Security Life Insurance Company, a corporation with its principal place of business at 1405 W 2200 S, West Valley City, Utah 84119 ("Sentinel," and together with Atlantic Coast, the "A-CAP Insurers" or "Plaintiffs"), for their Verified Complaint against Defendant A.M. Best Rating Services Inc., a corporation with its principal place of business at 1 Ambest Road, Oldwick, New Jersey 08858 ("A.M. Best"), allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.     This is an action to enforce a contract for a rating agency's services.

2.     When insurers pick an agency, they want fairness, transparency, consistency, and objectivity. Insurers have a choice of which rating agency to use. A credit rating is only useful if the rating is backed up by the same accurate, reasoned analysis the rating agency has applied in the past and would apply to any insurer.

3.     Thus, a rating agency's consistent rating methodology – and its reputation for

adhering to that methodology – is its brand.  Insurers bargain for the application of a consistent methodology.  They want the agency to rate their creditworthiness according to the same consistent standards they apply to all insurers.

4.     Plaintiffs are two insurance companies which belong to a broader corporate group called A-CAP.  They have done business with A.M. Best for nearly fifty years.  To get, and keep, the A-CAP Insurers' business, A.M. Best made two key promises.  It agreed to consistently apply its policies and procedures when issuing ratings.  And it also agreed to cooperate with the A-CAP Insurers in good faith if they raised questions or concerns about its results or provided material information relevant to those results.

5.     The parties stuck to that course of performance for decades.  And when Atlantic Coast entered into a written contract with A.M. Best in 2005, that written contract incorporated the same bargain with A.M. Best that Sentinel had struck before.  Once again, A.M. Best promised to adhere to its rating methodologies and to give Atlantic Coast a meaningful opportunity to comment on A.M. Best's draft ratings.

6.     But in 2024, A.M. Best broke its promises.  After changing the team that rates the A-CAP Insurers, A.M. Best is now threatening to dramatically downgrade their ratings.  A.M. Best's threatened writedown is its ***third*** attempt to articulate a rationale for downgrading the A-CAP Insurers, after they rebutted two prior flawed writedown threats from A.M. Best.  But this third threat is still based on flawed methods, improper assumptions, and demonstrably false data. It also inexplicably ignores material information that the A-CAP Insurers provided that refutes the basis for A.M. Best's proposed downgrade.  Those errors violate the policies and procedures that A.M. Best told the world – and the A-CAP Insurers – it would follow.

7.     A.M. Best knows its conduct has fallen far short of its standards.  And it knows its

threatened rating deviates substantially from its past practices.  The A-CAP Insurers have repeatedly warned A.M. Best of the errors and deviations.  But instead of fixing those errors and respecting its prior practices, A.M. Best has refused to meaningfully engage with the A-CAP Insurers.

8.     

9.     The A-CAP Insurers bring this suit to get the benefit of their bargain.  The Court should enjoin A.M. Best from issuing a faulty rating the insurers never agreed to.  It should also require A.M. Best to redo its rating according to its published methodology.  And the Court should award damages for A.M. Best's breach of its contracts, including the insurers' lost profits.

## PARTIES

10.     Atlantic Coast is a corporation organized under the laws of the State of South Carolina with its principal place of business in Charleston, South Carolina.

11.     Sentinel is a corporation organized under the laws of the State of Utah with its principal place of business in Salt Lake City, Utah.

12.     A.M. Best is a corporation organized under the laws of the State of Delaware with its principal place of business in Oldwick, New Jersey.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this civil action under 28 U.S.C. § 1332(a)(1) because there is complete diversity among the parties and because the amount in controversy, exclusive of interest and costs, exceeds $75,000.

14.     This Court has personal jurisdiction over A.M. Best under Fed. R. Civ. P. 4(e) and N.J. Court R. 4:4-4(a)(6) because A.M. Best resides and maintains its principal place of business in the State of New Jersey, and because Plaintiffs' claims arise from A.M. Best's conduct within the State of New Jersey.  Further, in Section 16 of its 2005 contract with Atlantic Coast, A.M. Best consented to the exclusive jurisdiction of the federal and state courts of this State to resolve any dispute arising in connection with that agreement.

15.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391 because Defendants reside in this District and because a substantial part of the events giving rise to Plaintiffs' claims occurred within this District.

## FACTUAL ALLEGATIONS

### I.     A.M. Best's Business Model

16.     Credit rating agencies offer an assessment of a company's creditworthiness in return for a fee paid by the company being rated.

17.     Insurance companies like the A-CAP Insurers seek out ratings from credit rating agencies primarily for the sake of credibility.  A good creditworthiness rating reassures investors and consumers seeking to purchase a policy.  The rating also provides investors and consumers with a means of comparing insurance companies against one another.  In addition, an insurer's

financial counterparties, including banks, investors, and borrowers, rely on an insurer's credit rating when deciding whether to do business with that insurer.

18.     Because these ratings have such important consequences for insurers' business models, insurers seek out credit rating agencies that will evaluate them fairly, transparently, and objectively based on consistent standards.  Rating agencies compete for the business of insurance companies by offering a clear brand – a rating system based on an objective methodology.  Rating agencies advertise that brand by publishing their methodologies publicly.  Rating agencies hold themselves out to customers as offering the same, objective rating criteria to any company that chooses to engage their services.

19.     In fact, rating agencies in the United States are required to adhere to federal regulations meant to ensure that they act predictably, objectively, and fairly.  Certain Nationally Recognized Statistical Rating Organizations ("NRSROs") are regulated by the Securities and Exchange Commission.  Under the Commission's regulations, NRSROs are required to make disclosures about their rating methodologies.  They are also required to apply any material changes to their rating methodologies consistently to all current and future credit ratings to which those changed methods apply.  In addition, changes to an NRSRO's rating methodologies must be approved by the NRSRO's board of directors.

20.     A.M. Best purports to provide credit ratings to carriers using a number of quantitative and qualitative data points, including balance sheet strength, operating performance, business profile, and enterprise risk management.  A.M. Best publishes its methodologies publicly on its website.  In addition, A.M. Best is a registered NRSRO and has submitted a formal

description of its rating methods and practices in its registration statement with the Securities and Exchange Commission.

21.     On its website, in its press releases, and elsewhere, A.M. Best holds itself out as offering the same, standardized "Best Ratings" to any company that purchases its services.  A.M. Best provides several types of ratings.  As relevant here, A.M. Best offers: (1) Financial Strength Ratings ("FSR"), which are an opinion of each insurer's financial strength and ability to uphold contractual obligations to policyholders, and (2) Issuer Credit Ratings ("ICR"), which analyze an insurer's ability to meet financial obligations on a short- and long-term basis.

22.     A.M. Best's "FSR" ratings are depicted using a letter convention ranging from "A" to "D," with "A" indicating the greatest financial strength.  Additional pluses "+" or minuses "-" provide additional gradation within each level.  By assigning a "B" rating or lower, A.M. Best indicates that an insurer is "vulnerable to adverse changes in underwriting and economic conditions."

## II.     The Parties' Bargain

23.     The A-CAP Insurers are customers of A.M. Best.  Founded in 2012, A-CAP is a vertically integrated insurance group, meaning that it combines insurance, reinsurance, and investment activities under a single corporate umbrella.  As relevant here, through its life insurance companies – the A-CAP Insurers – A-CAP sells life insurance policies to individuals.

24.     The A-CAP Insurers have had relationships with A.M. Best long predating the formation of A-CAP.  In particular, Sentinel has turned to A.M. Best for its ratings since at least 1976.  On information and belief, Atlantic Coast's relationship with A.M. Best also long predates A-CAP's formation in 2012.

25.     A.M. Best's relationship with Atlantic Coast is memorialized in a 2005 "Ratings Services Agreement."  A copy of that Ratings Services Agreement is attached as Exhibit A to this

Verified Complaint.  Sentinel and A.M. Best do not have a written contract.  Rather, A.M. Best and Sentinel have a course of performance that dates back to at least 2012, and (on information and belief) for decades before that.  Under Sentinel's unwritten contract, Sentinel annually renews its agreement that A.M. Best will provide a credit rating.

26.     Each of the A-CAP Insurers have purchased rating services from A.M. Best annually since at least 2012.

27.     The Atlantic Coast and the Sentinel agreements have materially similar terms.  As relevant here, the parties made two key agreements about the way A.M. Best would rate the A-CAP Insurers.

**A.      A.M. Best's Agreement To Honor Its Policies and Practices**

28.     *First*, the A-CAP Insurers and A.M. Best agreed that A.M. Best would adhere to its published methodologies and established prior practices when rating the A-CAP Insurers' creditworthiness.  Throughout their relationship after 2012, A.M. Best consistently abided by its public rating methodologies when rating the A-CAP Insurers.  The Atlantic Coast agreement memorializes this course of performance by stating that A.M. Best would provide "Best Ratings" – in other words, the same rating system that A.M. Best held out as its brand.  "Best Ratings" are defined as the A.M. Best policies and procedures made available through the A.M. Best website.

29.     Indeed, even during the parties' recent dispute, A.M. Best acknowledged that the rating methodologies were part of the parties' agreement.  When asked in a March 26 email for a copy of Sentinel's and Atlantic Coast's contracts, an A.M. Best representative directed Sentinel to the "definitions, process/procedures and methodologies related to our current rating services and procedures" on A.M. Best's website.

30.     A.M. Best and the A-CAP Insurers likewise agreed to a consistent set of practices for how A.M. Best would compile its ratings.  For example, a key component of A.M. Best's

ratings method is a Best Capital Adequacy Ratio ("BCAR"), or a ratio of an insurer's available capital against its capital needs.  For the A-CAP Insurers, A.M. Best consistently distinguished between a "company level" BCAR score, and a "global" BCAR score.  The company-level BCAR score includes only assets held by the A-CAP Insurers.  The global BCAR score reflects assets held by the A-CAP Insurers *and* their direct affiliates (but not risks held by *reinsurers* of those affiliates).  Both BCAR scores were consistently presented to the A.M. Best rating committee.

31.    As another example, when assessing the creditworthiness of assets held by the A-CAP Insurers, A.M. Best always relied on valuations and risk ratings of these assets provided by the A-CAP Insurers.  Those ratings were obtained from reliable, objective, third-party entities like Kroll.

### B.    A.M. Best's Agreement To Cooperate with the A-CAP Insurers

32.    *Second,* A.M. Best and the A-CAP Insurers also consistently agreed to allow the A-CAP Insurers a meaningful opportunity to respond to A.M. Best's proposed ratings.  And they agreed that A.M. Best would actually consider and evaluate their responses in good faith.  This has been part of the parties' longstanding course of performance.  For example, A.M. Best would always share its BCAR score with the A-CAP Insurers and allow them to provide input on that score.   A.M. Best would give the A-CAP Insurers an opportunity to identify and correct inaccuracies before the A.M. Best rating committee formally issued a credit rating to the A-CAP Insurers.  A.M. Best would typically provide a week's notice before presenting a BCAR score to the rating committee so that the A-CAP Insurers could examine the score and identify any issues.

33.    Those agreements are also reflected in A.M. Best's published policies and methodologies.  Those publications state that "[m]eetings or conference calls with the management teams of rated entities/issuers are an integral part of A.M. Best's interactive rating process."  That rating process *requires* a scheduled rating meeting to "clarif[y] [] information previously received

or obtained."  They also state A.M. Best will use information provided by a rated entity to apply risk ratings to an insurer's bond portfolio, and that A.M. Best "relies primarily" on information provided by the rated entity.

34.    For Atlantic Coast, the agreement to cooperate in good faith is also memorialized, in part, in A.M. Best's promise in the 2005 contract to provide Atlantic Coast a "reasonable opportunity to comment upon [any] draft report" A.M. Best creates.

## III.    A.M. Best's Breach of the Parties' Bargain

### A.    A.M. Best's Deviation from Its Prior Conduct and Refusal To Cooperate

35.    For years, A.M. Best had fulfilled its obligation to communicate with the A-CAP Insurers, consider information provided by the A-CAP Insurers in good faith, and conduct a reasonable rating process with the goal of providing accurate, updated information to the public. However, less than a year ago, A.M. Best abandoned these practices and initiated a capricious review process that swung wildly between arbitrary ratings without considering relevant information or cooperating with the A-CAP Insurers.  A.M. best has flatly refused to cooperate with the A-CAP Insurers regarding the ratings process, even hanging up on the A-CAP Insurers' representatives to avoid scrutiny.

36.    Beginning in July 2023, a new team at A.M. Best took on responsibility for assessing and rating the A-CAP Insurers.  The new team abandoned the established practices A.M. Best and Plaintiffs had agreed to.  For example, the new A.M. Best team refused to calculate a global BCAR score, much less provide one to the rating committee.  Additionally, the new A.M. Best team refused to accept credit ratings included in questionnaires provided by the A-CAP Insurers.  Through these and other deviations from established practices, A.M. Best now threatens to issue a massive – and sudden – ratings downgrade.

37.    A.M. Best's threatened downgrade arises out of its fixation with financial pressures

on a reinsurer called 777 Re.  The new A.M. Best team has claimed that the A-CAP Insurers need to shift risks held by 777 Re to different reinsurers to avoid exposure to 777 Re.  However, the A-CAP Insurers do not have a direct reinsurance relationship with 777 Re.  Rather, 777 Re provides reinsurance to affiliate entities who, in turn, provide reinsurance to the A-CAP Insurers.  In other words, 777 Re is two steps removed from the A-CAP Insurers.  Accordingly, while a reduction of the value of 777 Re's assets might affect the credit rating of the A-CAP Insurers' **affiliates**, it should not directly affect the credit rating of the A-CAP Insurers themselves.

38.     Nevertheless, on February 23, 2024, the new A.M. Best team adjusted one type of rating for the A-CAP Insurers – the Long Term Issuer Credit Rating, or "ICR" – downward from bbb+ to bbb.  That adjustment largely reflects pressures on 777 Re.  A.M. Best advised the A-CAP Insurers to work to reduce their and their affiliates' exposure to 777 Re.  A.M. Best told the A-CAP Insurers they were on "watch status" and that A.M. Best would provide the A-CAP Insurers six months to address A.M. Best's concerns.  This was consistent with A.M. Best's long-running practice of providing six months to insurers on watch status before the next rating action.  In response to A.M. Best's advice, A-CAP promptly began taking steps to improve the A-CAP Insurers' credit rating, including by raising additional capital and by "recapturing and replacing" exposure to 777 Re – in other words, causing its affiliates to engage alternative reinsurers.  A-CAP has already successfully executed a substantial part of its "recapturing and replacing" plan without the A-CAP Insurers or any A-CAP entity incurring any losses.

39.     Yet, over only a few short weeks, the new A.M. Best team rushed to produce another credit rating for the A-CAP Insurers that would punish them for 777 Re's failures, even though 777 Re did not directly reinsure the A-CAP Insurers.  The A.M. Best team now sought to downgrade the A-CAP Insurers' FSR – the most important rating that the A-CAP Insurers'

10

counterparties consider when deciding whether to do business with them.

40.     There was and is no apparent reason for A.M. Best's decision to review the A-CAP Insurers' credit ratings less than a month after its latest rating action.  Nevertheless, the new A.M. Best team operated on an accelerated schedule.  On March 7, A.M. Best requested a "touch-point meeting in the next few weeks" to discuss the progress A-CAP had made raising additional capital and adjusting its exposure to 777 Re.  That "touch-point meeting" was eventually scheduled for March 27.  But on Friday, March 22, A.M. Best wrote to the A-CAP Insurers to say that it would present the A.M. Best rating committee with a new BCAR score on "either Monday afternoon or Tuesday morning."  That new score contained a *$142 million* downward "manual adjustment" to the A-CAP Insurers' assets, resulting in a significantly reduced BCAR score.

41.     A-CAP immediately pointed out to A.M. Best that the $142 million "manual adjustment" contained several obvious errors.  Most notably, it was based on outdated, factually incorrect information.  For example, the "manual adjustment" relied on an outdated asset valuation from *December 2022*.  It ignored the fact that A-CAP was finalizing a transaction to recapture and replace risk, shifting it away from 777 Re to other reinsurance carriers.  It ignored the fact that the A-CAP Insurers had transferred $95 million of the relevant assets from their books by the end of 2023.  And it ignored a $50 million capital raise that is on pace to be completed by April 30.  In the past, A.M. Best credited the A-CAP Insurers for such imminent capital raises.

42.     Rather than address these issues, the new A.M. Best team moved to downgrade the A-CAP Insurers even more dramatically.  In a March 25 email, A.M. Best not only refused to address the errors that A-CAP had highlighted – it stated that it would now apply *$1 billion* in asset writedowns based largely on assets held outside of the A-CAP Insurers' books.  A.M. Best said it would immediately present a new BCAR score reflecting that dramatic adjustment to its

rating committee without any input from the A-CAP Insurers.  The next morning, on March 26, A.M. Best informed A-CAP that the $1 billion adjustment would result in a ***three-step*** downward adjustment of the A-CAP Insurers' FSR, from B++ (Good) to B- (Fair).  A.M. Best's published ratings methodology – which states that "ratings typically move no more than one or two notches when rating actions occur" – confirms this downgrade would be extraordinary.  In fact, A.M. Best was in such a rush to enter an extraordinary downgrade that its first draft press release announcing the downgrade contained the wrong rating – B rather than B- – an error that A.M. Best acknowledged.

43.     Again, A.M. Best's $1 billion adjustment was largely based on A.M. Best's decreased valuation of assets held by 777 Re, not assets held by the A-CAP Insurers or their affiliates.  The decision to consider risk held by entities two steps removed from the A-CAP Insurers departed from A.M. Best's consistent past practice.  And like the $142 million manual adjustment, it was demonstrably wrong.  Among other flaws, it assumed that $888.6 million of assets, or nearly 89% of the $1 billion, are ***completely worthless***, even though those assets have significant value according to objective, third-party valuations provided by the A-CAP Insurers, are supported by highly valuable collateral, have independent operations, are highly liquid, or have some combination of those attributes.  The $1 billion adjustment also double counted at least $95 million of charges that are already included in the $142 million manual adjustment.

44.     Following A.M. Best's proposed three-step downgrade, the A-CAP Insurers initiated a formal appeal.  Once again, A.M. Best tried to rush the process in violation of its past practices.  Even though A.M. Best had almost always provided 48 hours to submit an appeal, this time A.M. Best demanded, without explanation, that materials supporting the requested appeal be provided within 2.5 hours.

45.     Nonetheless, the A-CAP Insurers provided the information on A.M. Best's arbitrary timeline.  In response, A.M. Best complained that it did not want to "fish" through the data room for materials.  Thereafter, the A-CAP Insurers reorganized the data room they had established and continued populating it with a significant amount of new and highly relevant materials for A.M. Best's review.  Those materials included audit letters, appraisals, other third-party valuation materials, transaction documents, and financial statements.  They demonstrated that A.M. Best's decision to write down the entire value of nearly $900 million of assets was unjustified and flawed.  For example, the A-CAP Insurers provided asset valuations showing that A.M. Best's writedowns were on assets that had substantial, verified worth, and did not have *zero* value as A.M. Best claimed.

46.     In the data room, the A-CAP Insurers also provided *new* information relating to, among other things, its successful recapture and replacement of approximately $510 million of 777 Re related assets and $1 billion in reserves.  Through this process, which was completed during the pendency of the appeal, all $510 million of the assets were transferred to a new insurer at par, meaning there was no loss to any A-CAP entity, including the A-CAP Insurers.  Importantly, this recapture and replacement was the first and largest step of a three-step process which A-CAP expects to conclude on April 30, 2024, and which will completely eliminate the A-CAP Insurers' exposure to 777 Re.

47.     The A-CAP Insurers expected this information to resolve A.M. Best's purported concerns.  And, in light of the failure of the new A.M. Best team to cooperate in good faith, the A-CAP Insurers requested a new team for purposes of the appeal.  But A.M. Best refused to replace the team or consider the appeal in good faith, instead opting to move the goal post once again. During an April 17, 2024 phone call, A.M. Best announced that it was planning to present a new

13

adjustment of **$295 million** to its rating committee, and stated that it would present that adjustment

to the rating committee in just three business days, on April 22.  What is more, during an April 19

phone call, A.M. Best informed the A-CAP Insurers that it would be issuing **the same B- rating** it

had threatened **before** A-CAP secured the recapture and replacement of a significant portion of the

relevant assets.

48.     On April 21, in an effort to stave off litigation and correct the mistakes of the A.M.

Best analyst team, the A-CAP Insurers requested a review of the rating decision by an independent

body at A.M. Best called Rating Evaluation Services.  A.M. Best had used this service in the past,

and expected to be able to use it again.  The A-CAP Insurers also asked that A.M. Best reconsider

its rating decision and provide the six-month period it had promised to allow the A-CAP Insurers

to complete the recapture and replacement project.  However, on Monday, April 22, A.M. Best

informed the A-CAP Insurers that it would not reconsider its writedowns, but instead proceed with

the committee meeting and communicate a B- rating decision the same day.

49.     After three consecutive, yet markedly different, "manual adjustments," it is obvious

that A.M. Best is searching to justify a rating downgrade it had already decided on, regardless of

the facts.  It is also obvious from A.M. Best's rush to judgment, particularly given A-CAP's

successful completion of the first step of the three-step recapture and replacement plan which A-

CAP expects to complete entirely by the end of the month.  The A-CAP Insurers attempted to

explain A.M. Best's errors and provide information proving that its valuations are inaccurate, but

A.M. Best has refused to review the information provided or explain its reasoning.

50.     The latest $295 million adjustment also reflects several specific mistakes and

refusals to cooperate in good faith with the A-CAP Insurers.  *First*, A.M. Best's analyst **admitted**

that he had not reviewed the third-party valuations provided by the A-CAP Insurers in the data

room.  Instead, A.M. Best relied on two sources of valuations:  a report it received from 777 Re by an investment adviser called Winthrop Capital, and an outdated valuation report from Kroll published in 2022.  A.M. Best refused to provide the Winthrop report to the A-CAP Insurers, but it did identify the assets valued in the Winthrop report.  The A-CAP Insurers commissioned Winthrop to provide another valuation of the same assets and provided that valuation in the data room, but A.M. Best ignored it, along with the rest of the valuations the A-CAP Insurers provided.

51.     *Second*, instead of making a good-faith effort to determine the value of distressed assets, A.M. Best once again simply wrote off ***the entirety*** of assets it identified as distressed.  The valuations the A-CAP Insurers provided – including the valuation it solicited from Winthrop – as well as the outdated Kroll report all attributed significant value to the relevant assets.  But A.M. Best wrote those assets down to a value of $0.  A.M. Best should have (but did not) continued its prior practice – and the industry-standard practice – of using objective information to revalue assets it believes are troubled to update the A-CAP Insurers' credit rating.

52.     *Third*, in order to get around the fact that 777 Re's assets are two steps removed from the A-CAP Insurers, A.M. Best simply asserted that 777 Re is a direct affiliate of the A-CAP Insurers.  That radical assertion reflects an aggressive accounting decision that is inaccurate, unjustified, and unproven.  The A-CAP Insurers told A.M. Best that decision was wrong. Nevertheless, A.M. Best relied on that assertion not only to attribute writedowns of assets held by 777 Re directly to the A-CAP Insurers, but also to attribute writedowns of assets of affiliates of 777 Re to the A-CAP Insurers as well.

53.     *Fourth*, A.M. Best penalized the A-CAP Insurers for risk exposure purportedly held by two of its affiliates called JAZZ and SAR, but refused to credit the A-CAP Insurers for the $63 million in capital and collateral held by those same entities that directly supported the assets against

any risks they faced. Standard accounting practice (and common sense) require that if A.M. Best seeks to charge the A-CAP Insurers with risks held by affiliates, it must also take into account the assets which balance that risk.

**B.      A.M. Best's Deviation from Its Published Rating Methodologies**

54.      As a regulated NRSRO, AM Best must ensure that any changes to its credit rating procedures or methodologies be "applied consistently to all credit ratings," 15 U.S.C. § 78o-7(r)(2)(A), and that its procedures and methodologies are applied "in a manner that is consistent for all types of obligors, securities, and money market instruments," 17 C.F.R. § 240.17g-8(b)(3). Despite these obligations, A.M. Best has failed to consistently apply its procedures or methodologies with respect to the A-CAP Insurers. The $142 million, $1 billion, and $295 million adjustments all deviated from A.M. Best's formal, regulated rating methodologies.

55.      *First*, A.M. Best's methodology states that it would use information supplied by an insurer to apply risk ratings to an insurer's bond portfolio. It also states that A.M. Best "relies primarily" on information provided by the rated entity. And A.M. Best's consistent past practice was to accept the risk ratings in the A-CAP Insurers' questionnaire, including risk ratings provided by third-party ratings services. But in a striking contrast to these published procedures and consistent past practices, the new A.M. Best team ignored the third-party risk ratings in the A-CAP Insurers' questionnaire and instead substituted its own, more negative, risk ratings. Then, when the A-CAP Insurers provided substantial information during the appeal process, A.M. Best ignored that material and instead relied on other materials, much of which it did not even provide to the A-CAP Insurers to evaluate.

56.      *Second*, A.M. Best's methodology provides that it will apply certain extra "risk charges" – called "C-1" – only to risk introduced by affiliated entities. But A.M. Best assessed risk charges on the writedowns of 777 Re's assets (a 25% charge in some instances, and a 100%

charge in others).  A.M. Best's methodology provides that it will assess these additional risk charges only for ***affiliated*** assets.  But 777 Re is not an affiliated entity – it is a reinsurer of an affiliated entity.  It is two steps removed from the A-CAP Insurers.  Applying the risk charges for those assets was thus improper.

57.     *Third*, A.M. Best's methodology states that certain risk charges should be adjusted to reflect a specific kind of reinsurance agreement called "modified coinsurance."  The A-CAP Insurers' affiliates have precisely these kinds of modified coinsurance agreements with 777 Re. But A.M. Best ***still*** attributed the entirety of its writedown of 777 Re's assets to the A-CAP Insurers without any adjustment.  Risk charges associated with modified cosinsurance agreements should have been offset entirely.

## IV.     The Harm to the A-CAP Insurers

58.     Plaintiffs understand that A.M. Best intends to publish its defective rating decision as soon as today, April 23.  Consequently, Plaintiffs have brought this action on an emergency basis to prevent the irreparable harm that publication will cause.

59.     ███████████████████████████████████████████████
████████████████████████████████████████.

60.     ███████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████

61.     ███████████████████████████████████████████████

█████████████████████████████████████████████████████

17

62. ████████████████████████████████████████

63. ████████████████████████████████████████

64. ████████████████████████████████████████



65. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

66. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### COUNT I: Breaches of Contract and Covenants of Good Faith and Fair Dealing (Sentinel)

67.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

68.     A.M. Best and Sentinel entered into a valid and binding contract in or around 1976 for the provision of credit ratings services.  That contract has continued in force through the present day.

69.     Under that contract, Sentinel agreed to pay A.M. Best to rate Sentinel's creditworthiness from time to time.  Two terms of that contract were that A.M. Best would adhere to its published ratings methodologies in rating Sentinel and that A.M. Best would cooperate with Sentinel in good faith to voluntarily resolve any questions or concerns Sentinel may have about A.M. Best's proposed credit ratings of Sentinel.  That contract was established through the parties' oral and written agreements for the provision of ratings services and through their course of performance from 1976 to 2024.  In the alternative, that agreement was implied in law or fact.

19

70.     Sentinel has performed all of its obligations under the contract and has not breached any obligation nor excused the performance by A.M. Best of any of its obligations.  Alternatively, any obligation of Sentinel has been excused and rendered futile by A.M. Best's conduct.

71.     A.M. Best has breached the parties' contract by failing to adhere to its published rating methodologies in rating Sentinel's creditworthiness and by failing to cooperate in good faith to resolve Sentinel's questions and concerns about A.M. Best's draft ratings.

72.     A.M. Best's conduct also breached the implied covenant of good faith and fair dealing because, by failing to adhere to its ratings methodologies or cooperate with Sentinel in good faith, A.M. Best has deprived Sentinel of the benefit of its bargain, that is, a rating based on consistent, transparent, and objective methodologies.

73.     As a direct and proximate cause of A.M. Best's breaches of the contract, Sentinel has suffered and will continue to suffer significant damages, including but not limited to fees paid to A.M. Best, lost profits, and out-of-pocket costs.  Accordingly, A.M. Best should be required to pay compensatory and consequential damages for the harm it has caused Sentinel.

74.     Sentinel is therefore entitled to damages caused by A.M. Best's conduct in an amount to be proven at trial.

75.     Sentinel is also entitled to an order of specific performance enjoining A.M. Best from issuing the rating produced in violation of the parties' contract, recalculating that rating in accordance with A.M. Best's published procedures and the contract, and requiring A.M. Best to actually consider Sentinel's comments upon A.M. Best's draft rating after providing Sentinel a meaningful opportunity to offer such comments.  Specific performance is warranted because Sentinel lacks an adequate remedy at law, given that, in addition to the quantifiable harms described above, A.M. Best's conduct has caused or threatens to imminently cause Sentinel loss

of market share, loss of business opportunities, reputational harm, and a decrease to Sentinel's credit ratings.  Further, this Court may issue an efficient decree that will not require continuing superintendence because an order of specific performance can be limited to the specific breaching credit rating threatened to be issued by A.M. Best.

76.     Sentinel is also entitled to a declaratory judgment stating that A.M. Best's ongoing and threatened conduct in connection with the A-CAP Insurers' rating is in breach of the parties' contract.  A real and substantial controversy exists because A.M. Best has stated that it intends imminently to issue a credit rating that would cause Sentinel substantial economic and reputational harm.  A declaratory judgment would conclusively resolve that dispute by determining the parties' rights and obligations under the contract.  And a declaratory judgment would also be of great practical use by maintaining the status quo before A.M. Best's actions cause Sentinel irreparable harm.

### COUNT II: Breaches of Contract and Covenants of Good Faith and Fair Dealing (Atlantic Coast)

77.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

78.     The 2005 Ratings Services Agreement between A.M. Best and Atlantic Coast is a valid and binding contract.

79.     Under the 2005 Ratings Services Agreement, Atlantic Coast agreed to pay A.M. Best to rate Atlantic Coast's creditworthiness from time to time.  In Sections 1 and 2 of that agreement, and as further established by the parties' course of performance from 2005 to 2024, the parties agreed that A.M. Best would adhere to its published rating methodologies in rating Atlantic Coast.  In addition, in Section 4 of that agreement, and as further established by the parties' course of performance, the parties agreed that A.M. Best would cooperate with Atlantic Coast in good

faith to voluntarily resolve any questions Atlantic Coast may have about A.M. Best's ratings.

80.   Atlantic Coast has performed all of its obligations under the contract and has not breached any obligation nor excused the performance by A.M. Best of any of its obligations. Alternatively, any obligation of Atlantic Coast has been excused and rendered futile by A.M. Best's conduct.

81.   A.M. Best has breached the parties' contract by failing to adhere to its published rating methodologies in rating Atlantic Coast's creditworthiness and by failing to cooperate in good faith to resolve Atlantic Coast's questions and concerns about A.M. Best's draft ratings.

82.   A.M. Best's conduct also breached the implied covenant of good faith and fair dealing because, by failing to adhere to its rating methodologies or cooperate with Atlantic Coast in good faith, A.M. Best has deprived Atlantic Coast of the benefit of its bargain, that is, a rating based on consistent, transparent, and objective methodologies.

83.   As a direct and proximate cause of A.M. Best's breaches of the contract, Atlantic Coast has suffered and will continue to suffer significant compensatory and consequential damages, including but not limited to A.M. Best's fees, lost profits, and out-of-pocket costs.

84.   To the extent that A.M. Best asserts that Atlantic Coast's damages are limited by the limitation-of-liability clause provided in Section 12 of the Rating Services Agreement, that clause is unenforceable because A.M. Best acted (at least) recklessly in preparing a draft rating that A.M. Best knew violated its public methodologies and, if issued, would cause Atlantic Coast substantial harm.  Further, the clause is unenforceable because its enforcement would adversely affect the public interest, because A.M. Best is obligated similar to a common carrier to uniformly and objectively apply its rating methodologies to all insurers that it rates, and because A.M. Best's actions in connection with the contract have been unconscionable.

85.     Atlantic Coast is therefore entitled to damages caused by A.M. Best's conduct in an amount to be proven at trial.

86.     Atlantic Coast is also entitled to an order of specific performance enjoining A.M. Best from issuing the rating produced in violation of the parties' contract, recalculating that rating in accordance with A.M. Best's published procedures and the contract, and requiring A.M. Best to actually consider Atlantic Coast's comments upon A.M. Best's draft rating after providing Atlantic Coast a meaningful opportunity to offer such comments.  Specific performance is warranted because Atlantic Coast lacks an adequate remedy at law, given that, in addition to the quantifiable harms described above, A.M. Best's conduct has caused or threatens to imminently cause Atlantic Coast loss of market share, loss of business opportunities, reputational harm, and a decrease to Atlantic Coast's credit ratings.  Further, this Court may issue an efficient decree that will not require continuing superintendence because an order of specific performance can be limited to the specific breaching credit rating which A.M. Best has prepared.

87.     Atlantic Coast is also entitled to a declaratory judgment stating that A.M. Best's ongoing and threatened conduct in connection with the A-CAP Insurers' rating is in breach of the parties' contract.  A real and substantial controversy exists because A.M. Best has stated that it intends imminently to issue a credit rating that would cause Atlantic Coast substantial economic and reputational harm.  A declaratory judgment would conclusively resolve that dispute by determining the parties' rights and obligations under the contract.  And a declaratory judgment would also be of great practical use by maintaining the status quo before A.M. Best's actions cause Atlantic Coast irreparable harm.

## **PRAYER FOR RELIEF**

WHEREFORE, the A-CAP Insurers respectfully request that the Court enter judgment in

their favor and against A.M. Best as follows:

     A.     Declaring that A.M. Best has breached its obligations under the parties' contracts;

     B.     Enjoining A.M. Best from issuing the rating it has prepared in breach of the parties' contracts;

     C.     Entering an order of specific performance requiring A.M. Best to recalculate the A-CAP Insurers' rating in accordance with A.M. Best's published procedures and the contracts;

     D.     Entering an order of specific performance requiring that A.M. Best actually consider the A-CAP Insurers' comments upon A.M. Best's draft rating after providing the A-CAP Insurers a reasonable opportunity to offer such comments;

     E.     Awarding compensatory and consequential damages against A.M. Best in an amount to be proven at trial but in excess of $150,000, including the A-CAP Insurers' lost profits caused by A.M. Best's breaches;

     F.     Awarding pre-judgment and post-judgment interest;

     G.     Awarding the A-CAP Insurers their fees and costs as provided by law; and

     H.     Awarding such further relief as the Court deems just and proper.

## **JURY DEMAND**

The A-CAP Insurers demand a trial jury on all issues so triable by right.


Dated: April 23, 2024          Respectfully submitted,


                    */s/ Liza M. Walsh*
                    Liza M. Walsh
                    Joseph L. Linares
                    Walsh Pizzi O'Reilly Falanga LLP
                    100 Mulberry Street, 15th Floor
                    Newark, NJ  07102
                    Tel.: (973) 757-1100

lwalsh@walsh.law
jlinares@walsh.law

Steven F. Molo (*pro hac vice* to be submitted)
Justin Ellis (*pro hac vice* to be submitted)
Josh Bloom (*pro hac vice* to be submitted)
Mark Kelley (*pro hac vice* to be submitted)
MoloLamken LLP
430 Park Avenue, 6th Floor
New York, NY  10022
Tel.: (212) 607-8170
smolo@mololamken.com
jellis@mololamken.com
jbloom@mololamken.com
mkelley@mololamken.com

Jennifer Fischell (*pro hac vice* to be submitted)
Lois Ahn (*pro hac vice* to be submitted)*
MoloLamken LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Tel.: (202) 556-2007
jfischell@mololamken.com
lahn@mololamken.com

   *Admitted only in New York; practice limited to matters*
   *before federal courts and federal agencies*

*Attorneys for Plaintiffs*

25

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not the

subject of any other action pending in any court, or of any pending arbitration or administrative

proceeding.


Dated: April 23, 2024


*/s/Liza M. Walsh*_____
Liza M. Walsh

## **LOCAL CIVIL RULE 201.1 CERTIFICATION**

Pursuant to Local Civil Rule 201.1, I hereby certify that this action is not subject to compulsory arbitration because Plaintiffs seek injunctive relief and because Plaintiffs seek damages in excess of $150,000.

Dated: April 23, 2024

                              */s/ Liza M. Walsh*
                              Liza M. Walsh

## **VERIFICATION**

I, Kenneth King, declare the following pursuant to 28 U.S.C. § 1746:

I am the Chairman and CEO of the A-CAP Group. I have read, am familiar with, and have personal knowledge of the contents of the foregoing Verified Complaint. The allegations set forth in the Verified Complaint are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

April 22nd, 2024

Kenneth King

# Exhibit A

# A. M. BEST COMPANY
### RATING SERVICES AGREEMENT

This Rating Services Agreement (the "Agreement"), effective as of the 19 day of April, 2005 between A.M. Best Company, Inc., ("Best") with its principal office at Ambest Road, Oldwick, New Jersey 08858, U.S.A. and Atlantic Coast Life Insurance Company with its principal office at 1565 Sam Rittenburg Blvd., Charleston, SC 27407(the "Issuer").

1.    **Rating Services.**  Best agrees to assign Best Ratings (the "Rating"), as hereinafter defined, to the Issuer. Best reserves the right to monitor the Issuer and may revise, in its sole discretion, the Rating at any time.

2.    **Best's Rating.**  The Current Guide to Best's Financial Strength and Debt Ratings is available through the A.M. Best website at www.ambest.com. Best's Ratings are not a warranty, nor are they a recommendation of a specific policy form, claim practice or contract. Best's Ratings are not a recommendation to buy, hold or sell any financial obligation of the Issuer. The Rating is not an audit of the Issuer by Best, and Best is not acting as advisor to the Issuer. Nothing about the Rating is intended to, or should be construed as, creating a fiduciary relationship between Best and the Issuer. Best reserves the right to modify or change its rating criteria from time to time, when Best, in its sole discretion, without notice, believes such action is warranted.

3.    **Furnishing of Rating Information.**  Issuer agrees to furnish Best with all financial reports and information relevant to the rating process; the issuer has a continuing obligation to furnish information relevant to the rating process in a timely fashion.  The Rating may be adversely affected if in Best's opinion the information supplied by the Issuer is not complete, timely, or reliable.

4.    **Preparation of Report.**  Best will prepare a draft report based upon the information collected concerning the Issuer and other relevant matters. Best will not be limited in the source or nature of information that it collects or considers. The Issuer will have a reasonable opportunity to comment upon the draft report; however, Best reserves the right to make the final decision as to what is ultimately published in its final report concerning the Issuer.

5.    **Assignment of the Best's Rating.**  Once the rating rationale has been reviewed by the Issuer, Best will assign the initial Rating to the Issuer.

6.    **Non-Acceptance of the Best's Rating.**  If the Issuer does not accept the initial Rating, the Issuer may elect not to have the Rating published. In those circumstances, Best will use the information provided by the Issuer in Best's publications, products and services. Best reserves the right to publish a "Public Data" rating largely based on publicly available information in the future. After Best has assigned and published its initial Rating, Best shall have the absolute right to publish Issuer's Rating after said Rating has been affirmed or changed by Best, not withstanding Issuer's non-acceptance of said Rating. Best reserves the right to continue to publish the Issuer's rating history.

7.    **Publication of Ratings and Reports by Issuer.**  The Issuer may publish, use, or disclose its Rating, provided that said Rating is current and presented accurately. The Issuer is not permitted to use Best's reports or any drafts thereof without the written permission of Best. Best's reports are prepared solely for the confidential use of Best's subscribers with all rights reserved. No part of Best's reports or any draft thereof may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopied, recorded, or otherwise, without the written permission of Best. Further details related to the proper use of A.M. Best's proprietary information are defined in Best's "Guide to Proper Use" at www.ambest.com.

8.    **Publication of Ratings and Reports by Best.**  Best will have the right to use and publish, or license others to publish, the Rating and the rationale for the Rating. The Issuer understands and agrees to permit Best to publish reports, without limitation, in all of Best's publications and services. The information published will be based on publicly available information, information obtained from the Issuer (unless previously identified in writing as confidential by the Issuer), and other sources. Issuer acknowledges Best's copyright in the reports published in Best's Insurance Reports, and other Best's publications, products and services (including www.ambest.com).

9.    **Rating Service Fee/Terms of Payment.**  Best charges a rating service fee (the "Fee") in connection with assigning the Issuers initial Rating. The initial Fee is payable to A.M. Best regardless of the Issuers acceptance or non-acceptance of Best's Rating.. The Issuer agrees to pay Best an initial Fee of $6,000. A renewal Fee also will be charged and is payable on an annual basis, invoiced on or about July 1st.  Best reserves the right to revise the Fee in the future. Any Fee revisions will be communicated in a timely manner to the Issuer.

The price quoted above will be in effect for 180 days from the date of issue of this agreement.

It is part of this agreement that Best reserves the right to rate all debt securities, preferred stock, surplus notes, commercial paper, or any other publicly traded financial obligation issued by the Issuer or affiliated companies. For all new public securities issued henceforth, the issuer agrees to promptly furnish Best with all relevant information, and agree to fees based on Best's standard fee schedule. Best's current Securities Rating Fee Schedule will be provided upon request. Best reserves the right to revise the Fee in the future. Any Fee revisions will be communicated in a timely manner to the Issuer.



*The Insurance Information Source*

# A. M. BEST COMPANY

The Issuers Fee will be invoiced once a year. All invoices are payable within forty-five (45) days. The Fee will be payable by the Issuer even if the Issuer does not accept a Best's Rating. Best shall be entitled to charge interest at the rate of one and one-half per cent (1.5%) per month on any invoice that remains unpaid forty-five (45) days after date of invoice.

In addition to the fee for services, the Issuer shall pay or reimburse Best for any sales, use, ad valorem, personal property, and any other taxes that may be imposed on Best or Issuer in connection with the rating service by any governmental authority. Best reserves the right to withdraw any rating for nonpayment.

**10.    Term of Agreement.**  This Agreement shall commence on the date hereof and shall continue in full force and effect until terminated by either party, upon at least 90 days written notice. During this 90 day period Best shall have the absolute right to publish Issuer's Rating as set forth in this agreement if said Rating is changed by Best. The termination of this Agreement shall not affect the rights of either party that shall have accrued prior to termination including Best's right to payment of its fee for rating work already performed.

**11.    Termination after Default.**  Either party may terminate this Agreement upon or after the breach of any material provision of this Agreement by the other party if the breaching party has not commenced to remedy such breach within thirty (30) days after written notice thereof by the other party and thereafter proceeded diligently to remedy such breach within a reasonable time. In no event shall such reasonable time to remedy such breach exceed sixty (60) days from the date of such notice.

**12.    Non-Liability.**  Best shall not be liable to the Issuer for any loss or injury caused, in whole or in part, by any negligence on the part of, or any contingency beyond the control of Best or any of its employees or agents, in the collection, compilation, analysis, interpretation, communication, dissemination, or delivery of any information. The parties expressly waive any claim for any loss or injury, or consequential, incidental or special damages or any nature whatsoever resulting from performance under this agreement. Nothing in this clause shall limit or exclude the liability of Best in respect of any liability which may not be limited or excluded by law.

**13.    Not an Expert.**  Best has not consented to and will not consent to being named an "expert" under the applicable securities laws, including without limitation, the United States federal securities laws, including without further limitation, Section 7, of the Securities Act of 1933.

**14.    Notices.**  Any notice or other communication required or which may be given pursuant to this Agreement shall be in writing and by prepaid courier delivery and shall be deemed to be received [48] hours after the time of delivery to courier. Any such notice or other communication shall be addressed to the other party at the address set forth in the preamble to this Agreement.

**15.    Waiver.**  The failure of either party to enforce at any time any of the provisions hereof shall not be construed to be a waiver of such provision or of the right of such party thereafter to enforce any such provision.

**16.    Governing Law/Consent to Jurisdiction.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey, without reference to any principles of conflict of laws. The parties consent to the exclusive jurisdiction of the federal and state courts in New Jersey to resolve any dispute arising in connection with this Agreement provided that, at the option of Best, proceedings may be commenced in the Courts of any territory where the Issuer carries on business. The application of the United Nations Convention on Contracts for the International Sale of Goods is expressly excluded.

**17.    Entire Agreement/Amendments.**  This Agreement supersedes any and all previous agreements made between the parties, oral or written, regarding the subject thereof, constitutes the entire agreement between the parties with respect to the subject matter hereof, and may not be varied in any way, except by an instrument in writing signed by both parties.

**18.    No Third Party Beneficiary.**  The provisions of this Agreement shall be binding upon and inure solely to the benefit of Best and the Issuer. No other person shall have any rights as a third party beneficiary of any of the provisions hereof.

In witness whereof, the parties have executed this Agreement as of the day and year first above written.

| **ISSUER** | **A.M. BEST COMPANY, INC.** |
|---|---|
| By: _Y. W. Scarborough_ | By: _Edward H. Easop_ |
| Print Name: _Y. W. SCARBOROUGH III_ | Print Name: Edward H. Easop |
| Title: _PRESIDENT & CEO_ | Title: Vice President |
| Date: _April 27, 2005_ | Date: April 19, 2005 |

